**NUNN'S BATTERY & ELECTRIC CO.,**
**Inc., Appellant,**

v.

**Arthur J. GOLDBERG, Secretary of Labor, United States Department of Labor, Appellee.**

**No. 19083.**

United States Court of Appeals
Fifth Circuit.

Jan. 18, 1962.

Jack Crenshaw, Montgomery, Ala., for appellant.

Miss Beate Bloch, Atty., D. of L., Miss Bessie Margolin, Asst. Sol., D. of L., Washington, D. C., for appellee.

Before RIVES and WISDOM, Circuit Judges, and CARSWELL, District Judge.

WISDOM, Circuit Judge.

This action is brought under the Fair Labor Standards Act, 29 U.S.C.A. §§ 206,

207, and 211. The Secretary of Labor asks for an injunction against Nunn's Battery & Electric Co., Inc. and two of its officers to enforce compliance with the minimum hourly wage, overtime wage, and record keeping requirements of the Act. The district court found that Nunn's Battery had violated the Act and issued an injunction against it. On appeal, Nunn's Battery makes two chief contentions: (1) its agreements for a regular weekly salary to cover the regular and overtime hours usually worked comply with the Act; (2) three of its employees whom the district court found were covered by the Act are not engaged in interstate commerce and therefore are not within the statute's coverage. We hold for the appellee on both questions.

Nunn's Battery operates a wholesale business with an office and warehouses in Montgomery, Alabama. Its sales are split about evenly between the sale of automotive parts and supplies and the sale of oxygen, acetylene and welding supplies. It purchases the major portion of its supplies from out-of-state sellers; approximately three to five per cent of its sales are to customers outside the state. It stores large quantities of supplies at its warehouses and usually fills orders from those stocks. Occasionally, however, it has to send to a local or out-of-state supplier for items to fill a special order. Sometimes Nunn's Battery sends automotive parts that its customers have turned in to its suppliers for repair or credit. In its welding supply business Nunn's Battery sells gas cylinders and refills them when they are empty. It picks up the cylinders from its customers and once or twice a week sends them to Albany, Georgia for refilling.

The company's employees work a regular, scheduled workweek that in most cases is 50½ hours. The general manager at one time instructed certain employees to report for work fifteen minutes earlier each morning, and until this practice was discontinued, shortly before the trial, these employees worked 52 hours a week. On occasions, the employees worked or attended sales meetings outside the regular scheduled hours. They were paid a regular weekly salary, and were not paid more when they put in extra hours or less when they were sick or missed time for some other reason. The lowest paid workers received $55.75 a week. According to the president, this amount represented payment at a dollar an hour for the first forty hours and time and a half for the remainder of the scheduled work week. The employees testified, however, that when they were hired there was no mention of an hourly rate. There were no written contracts of employment until just prior to the trial when the appellant drew up written contracts specifying that the employees were to be paid at an hourly rate and that they would receive time-and-a-half pay for all overtime work. Nunn's Battery did not keep any records of hours worked by certain employees. It kept some records for others, but the employees testified that they had worked extra hours on many occasions, and the records do not indicate any of these additional hours.

The three employees whose coverage under the Act is contested by the appellant are James P. Elliott, Billy Mack Ledbetter, and Mrs. Geraldine Fielder. Each has different duties and therefore presents an individual question. James P. Elliott works primarily on painting the company's cylinders. Usually he paints ones that are filled and ready to be sent to customers, but he also paints empties to be sent back to Albany, Georgia. Three or four times a week he makes deliveries of cylinders to local customers and brings back their empties, and he also regularly helps load and unload the truck that brings the refilled cylinders back from Albany.

Billy Mack Ledbetter works for Nunn's Battery as a counter salesman. Most of his work involves selling goods in stock to local customers. Occasionally, however, the customers bring in items to be returned to out-of-state suppliers or order an item that is not in stock and must be obtained from out of state. He answers the telephone when he is closest to it and transfers the call to someone

else or talks to the customer himself. While these calls generally are local a few come from other states. He also works as a replacement shipping clerk: when the regular shipping clerk is sick or on vacation he performs the duties of sending out orders to local and out-of-state customers.

Mrs. Geraldine Fielder is a clerical worker whose job is to post the sales and the shipments of goods coming in and to keep a running inventory of stock on hand.

### I.

Nunn's Battery argues that the injunction against it is improper since it goes beyond the violations that were committed. The appellant does not dispute the finding that it violated the record-keeping requirements. Nor does it dispute the fact that some of its employees have worked extra hours for which they have not been paid, and that the employees' regular weekly salary is not sufficient under any analysis to cover all the hours worked at the statutory minimum rates when the employees worked extra hours. But the appellant protests against the court's finding that the weekly wage rate is improper even in situations when the employees do not work extra hours. The point disputed is whether the arrangement satisfies the requirements for overtime pay at time and a half the regular wage rate.

The pertinent statutory provision, 29 U.S.C.A. § 207(a), declares: "no employer shall employ any of his employees who is engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." The "regular rate" is "the hourly rate actually paid for

the normal, non-overtime workweek." Walling v. Helmerich & Payne, Inc., 1944, 323 U.S. 37, 40, 65 S.Ct. 11, 13, 89 L.Ed. 29. This is "an 'actual fact,' and in testing the validity of a wage agreement under the Act the courts are required to look beyond that which the parties have purported to do." 149 Madison Ave. Corp. v. Asselta, 1947, 331 U.S. 199, 204, 67 S.Ct. 1178, 1181, 91 L. Ed. 1432. When employees regularly work more than forty hours a week and receive a standard wage each week the question arises whether the weekly payment genuinely represents payment at a regular rate for the first forty hours plus time and a half for the excess hours or, instead, represents a single wage rate applied to the first forty hours and the excess hours uniformly. Courts have often disregarded an employer's assertions of an overtime payment system and have found that a fixed weekly wage covered all working hours indiscriminately. Walling v. Helmerich & Payne, Inc., supra; Overnight Motor Transp. Co. v. Missel, 1942, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682; Beechwood Lumber Co. v. Tobin, 5 Cir., 1952, 199 F.2d 878; Bibb Mfg. Co. v. Walling, 5 Cir., 1947, 164 F.2d 179, cert. denied, 333 U.S. 836, 68 S.Ct. 607, 92 L.Ed. 1121. 29 U.S.C.A. § 207(a) is more than a repetition of the minimum wage provisions. It has the separate and particular purpose of discouraging the employment of workers for more than forty hours a week. Compliance with the section requires employers to establish a regular hourly wage and to pay one and one-half times that wage for each hour an employee works over forty hours within one week. The operative mechanism of the statute is the differential between the regular rate of pay and the overtime rate, since that is what compensates the employees for their having to work extra hours and that is what penalizes the employer for calling upon them to do so.[1]

---

1. In Overnight Motor Transp. Co. v. Missel, 1942, 316 U.S. 572, 577–578, 62 S. Ct. 1216, 1220, 86 L.Ed. 1682, the Supreme Court stated: "The provision of section 7(a) requiring this extra pay for overtime is clear and unambiguous. It calls for 150% of the regular, not the minimum, wage. By this requirement,

Two indispensable factors for compliance with this statute are missing from the oral wage agreements between Nunn's Battery and its employees: (1) an explicit understanding between the parties as to the existence of a regular wage rate that is stepped up for overtime hours and (2) a careful practice of recording the hours worked overtime by each employee and paying him for them at the increased rate. On these important factors the record shows abundant testimony by numerous employees that they were not told what their hourly rate of pay was and Nunn's Battery admits that it did not keep careful records of the hours worked or pay employees additional wages when they worked more than the normal number of working hours.

Confronted with clear evidence of its past violations, Nunn's Battery cannot complain at the injunction issued against it. Contrary to its declarations, the injunction does not exceed the scope of its past violations. In fact, the injunction is moderately worded and does nothing more than command Nunn's Battery not to violate certain explicit dictates of the Fair Labor Standards Act. It orders Nunn's Battery not to pay any of its employees engaged in interstate commerce or the production of goods for interstate commerce at less than one dollar an hour for the first forty hours, not to pay any such employee less than one and one-half times his regular rate for any hours worked over forty a week, and not to fail to keep and preserve records of the hours and wages of its employees.

We do not understand the decree to make any binding order as to what the regular rate of pay for the appellant's employees shall be, so long as the rate is over one dollar an hour. It may be that

misunderstanding on this matter has arisen from the judge's finding that the written contracts drawn up by the appellant on the eve of the trial were "a subterfuge". That finding was properly made, since Nunn's Battery attempted to rely on those contracts to recast the framework of its *prior* wage rates and to establish the presence of an hourly wage rate that had never existed. But those contracts, or similar ones, may properly govern future arrangements between the appellant and its employees, provided that they are bona fide contracts and are faithfully carried out. We do not read the trial judge's findings as an invalidation of prospective contracts; they represent instead his proper refusal to attribute to them any retroactive effect. It is not the purpose of 29 U.S.C.A. § 207 to prescribe that an hourly wage be set at any particular level; it is its purpose to require that an hourly wage be set at *some* level and that it be scrupulously adhered to, with augmented payments for overtime work. This is what the injunction requires on the part of Nunn's Battery.

## II.

Nunn's Battery fails also in its contentions that employees Elliott, Ledbetter, and Fielding were not engaged in interstate commerce. We note that the appellee does not argue that the appellant's entire operations are within interstate commerce. As stated in a leading case: "The fact that all of the [appellant's] business is not shown to have an interstate character is not important. The applicability of the Act is dependent on the character of the employees' work. A. B. Kirschbaum Co. v. Walling [316 U.S. 517, 524, 62 S.Ct. 1116, 86 L.Ed. 1638], supra. If a substantial part of an employee's activities relates to goods

although overtime was not flatly prohibited, financial pressure was applied to spread employment to avoid the extra wage and workers were assured additional pay to compensate them for the burden of a workweek beyond the hours fixed in the act. In a period of widespread unemployment and small profits,

the economy inherent in avoiding extra pay was expected to have an appreciable effect in the distribution of available work. Reduction of hours was a part of the plan from the beginning." See also Walling v. Youngerman-Reynolds Hardwood Co., 1945, 325 U.S. 419, 423–424, 65 S.Ct. 1242, 89 L.Ed. 1705.

whose movement in the channels of interstate commerce was established by the test we have described, he is covered by the Act. Here as in other situations "* * * the question of the Act's coverage depends on the special facts pertaining to the particular business." Walling v. Jacksonville Paper Co., 1943, 317 U.S. 564, 571–572, 63 S.Ct. 332, 337, 87 L.Ed. 460. Since the question whether a substantial part of the employee's activities relates to goods moving in interstate commerce involves a factual determination, to prevail on appeal the appellant must show that the trial judge's findings were clearly erroneous. In our view substantial evidence supports the findings. James P. Elliott participates in interstate commerce by picking up empty cylinders for shipment out of state to be refilled, by painting cylinders destined for shipment out of state, and by helping to unload the truck bringing the cylinders to the appellant's yards from out of state.[2] Walling v. Jacksonville Paper Co., supra. There is ample basis for finding these activities to represent a substantial part of those performed by Elliott. It is conceded that the activities of Billy Mack Ledbetter in assisting the shipping clerk are within the coverage of the Act. Nunn's Battery asserts, however, that the trial judge based his finding not on those activities but on the fact that Ledbetter while working as a counter salesman occasionally took in automotive parts for shipment out of state, occasionally made up orders for out-of-state customers,[3] and sometimes answered long distance telephone calls from out of state. The trial judge indicated clearly that his finding was based on the combination of these activities,[4] including the activities as a shipping clerk. We agree that they form a sufficient basis for finding that Ledbetter is within the coverage of the Act. The finding as to Geraldine Fielding is also clearly supportable. One of her major jobs was to post all items of inventory received from suppliers. This was an integral part of the receipt of the goods which were indisputably moving in interstate commerce.

As this Court has stated, "Those who work either at selling or delivering across State lines, * * * are employed in commerce, whether they write the letters, keep the books, or load and unload or drive the trucks." Fleming v. Jacksonville Paper Co., 5 Cir., 1942, 128 F.2d 395, 398, aff'd sub nom., Walling v. Jacksonville Paper Co., supra.

The judgment is
Affirmed.

2. We find that the collection of the empty cylinders from Nunn's Battery's customers is a part of interstate commerce. The cylinders are brought back to a Nunn's Battery warehouse and shortly thereafter are sent to Georgia for refilling. Although Nunn's Battery does not have a contract requiring it to send the cylinders to Albany, Georgia or requiring its supplier there to receive and refill them, Nunn's Battery by established practice does send all of the empty cylinders to Albany for refilling, and at the time of collection the movement of the cylinders across the Alabama-Georgia line could have been anticipated to a certainty. These factors bring the initial collection within the reaches of interstate commerce under the principles declared in Walling v. Jacksonville Paper Co., 1943, 317 U.S. 564, 63 S.Ct. 332, 87 L. Ed. 460 and Stewart-Jordan Distributing Co. v. Tobin, 5 Cir., 1954, 210 F. 2d 427, 431.

3. Ledbetter's activities in receiving items for shipment out of state and in taking orders for goods to be obtained from out of state are within interstate commerce while his sales of goods from the company's own warehouse stock are not within interstate commerce. Walling v. Jacksonville Paper Co., 1943, 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460.

4. The finding of the trial judge was as follows: "In addition to replacing Revis when he was out [as shipping clerk], employee Billy Jack Ledbetter also occasionally took in generators and starters to be returned to the factory to be repaired, occasionally made up orders for out of state customers, and occasionally took long distance telephone calls, relating to the defendant's business."